[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The facts relevant to a discussion of the legal issues raised in this case will be discussed more fully in the opinion. But preliminarily it should be said that this case arises out of a dispute between the parties regarding a Reinsurance Agreement between them. This agreement provided for an arbitration process to resolve disputes over insurance coverage. Article 9 of the agreement sets out the agreement on arbitration.
The plaintiff, Hartford Steam Boiler Inspection and Insurance Company (HSB) informed the chairman of the arbitration panel selected by Industrial Risk Insurers (IRI) purportedly in compliance with Article 9 that it objected to the so-called Phase II arbitration process that was about to commence.
The plaintiff then filed this present action seeking an injunction restraining IRI from proceeding with the arbitration. The claim is made that (1) the IRI Loss Committee; failed to follow the methods set forth in Article 9 in selecting the arbitrators and (2) the committee wrongfully imposed arbitration procedures upon the arbitration panel and the parties.
It should be noted, however, that HSB is not merely seeking CT Page 12270 to restrain the defendant from proceeding with arbitration rather in its pleadings asks the court to in effect enforce the arbitration provision of the agreement by either itself appointing arbitrators pursuant to Article 9 or directing IRI to proceed with arbitration in compliance with its interpretation of Article 9.
This then is not a case where one or the other side is saying the dispute between the parties is not covered by the arbitration agreement. HSB seems to concede that. IRI on the other hand has filed a motion to stay proceedings in the HSB action and a motion to compel HSB to in effect arbitrate with the panel selected by the IRI Loss Committee.
 I
As noted in this case the parties entered into a Settlement Agreement to arbitrate the dispute between them in two phases. The agreement provided the arbitration would be conducted pursuant to Article 9 of a 1975 Reinsurance Agreement entered into by HSB with IRI's predecessor in interest Factory Insurance Association.
Section B of Article 9 is the part of the 1975 agreement or Treaty that is relevant to a resolution of this matter. That section reads as follows:
 "B. The IRI Boiler and Machinery Loss Subcommittee shall be appointed by the IRI Standing Loss Committee and shall consist of five members, two of whom shall be representatives of (IRI). Members which do not maintain inspection service for boiler and machinery insurance and two of whom shall be representative of IRI members which maintain inspection service for boiler and machinery insurance; the fifth member shall be a representative of the Reinsurer involved in the loss."
There can be no dispute that the Loss Committee under Article 9 is charged with the task of picking members of the Phase II arbitration panel. The initial question presented is whether given that assignment the Loss Committee complied with the contractual obligations set forth in Article 9 when it let it be known in January of 1994: that "current or former CEO's or senior executives" of IRI member companies would be eligible to serve on the panel. In an earlier opinion in this matter the court CT Page 12271 said: . . . "in the narrow case where it is claimed arbitrators were not chosen in the specific manner agreed to by the parties, the resolution of that claim is a jurisdictional one which the courts should decide before the arbitrators hear the case on the merits," Hartford Steam Boiler Inspection and Insurance Companyv. Industrial Risk Insurers, 12 Conn. L Rptr. 464, 468 (1994). At an earlier point the opinion said
 "Also the resolution of this particular dispute is simply a matter of contract interpretation . . . (HSB's) claim rests on questions of compliance with the particular contract provisions of this case and the rather mechanical question of whether arbitrators who have been appointed were appointed in accordance with the agreement to arbitrate."
The question becomes whether under the terms of Article 9 retirees can be selected as representatives of member companies to be panel members for the Phase II arbitration. This issue can be presented in two ways or from two perspectives (1) Reading Article 9 as a contractual term either the Loss Committee did or did not have the right to appoint retirees. (2) Even assuming the Loss Committee did have the authority under this contractual provision to conclude retirees could be representatives of member companies on the Phase II panel, was the Loss Committee decision on this matter dictated or improperly influenced by IRI staff and outside counsel for IRI staff?
The first question is strictly one of contract interpretation, the second question I suppose could be categorized as raising matters dealing with reasonable expectation of contract performance and goes to the larger issue of whether, as HSB seems to imply at one point in its brief, the very decision to consider retirees as appropriate representatives was part and parcel of a larger scheme by IRI staff and counsel to in effect select a panel of its own choosing, see pages 92-96 of HSB Post Hearing Brief of April 7, 1995.
Dealing strictly with the first question of contract interpretation the basic principles to be applied by a court seeking to interpret provisions of an arbitration are clear. As said in Volt Information Sciences v. Board of Trustees,489 U.S. 468, 478:
 . . . "(The FAA) simply requires courts to enforce privately negotiated agreements to arbitrate like other contracts in CT Page 12272 accordance with their terms. . ."
In interpreting Article 9 on this issue Federal interpretive guidelines based on a policy of favoring arbitration are not applicable. Thus the so-called "positive assurance" test mandates that doubts in the interpretation of contract language should be resolved in favor of "coverage," that is arbitration United SteelWorkers of America v. Warrior Gulf Navigation Co., 363 U.S. 574,582 (1960). But whether or not retirees should be able to sit on a Phase II arbitration panel under this article has nothing to do with coverage.
Also assuming that the Loss Committee had a fiduciary duty to HSB in formulating arbitration procedure and/or the Loss Committee was required to act in the utmost good faith in discharging its Article 9 responsibilities, it is difficult to see how, if the word "representative" in Article 9 is subjected to a purely linguistic analysis, an overarching fiduciary duty would require an entity in the position of the Loss Committee to interpret the word representative to bar retirees from service on the Phase II panel. In other words there is nothing about retirees as such that has been presented to the court to indicate they couldn't exercise arbitration responsibilities in a knowledgeable, intelligent, efficient, and fair manner.[1]
Common sense would indicate otherwise especially since the defined pool of retirees here would be "Former CEO's or senior executives". Strictures against discrimination based on age would foreclose interpreting "representative" as barring retirees on the state of this record if the interpretative analysis is based on the dictionary meaning of the word.
The issue is then one of ordinary contract interpretation. Should the word "representative" in Article 9 be defined as excluding retirees?
Random House Dictionary defines a representative in relevant part as "one who or that which represents another or others" — "an agent or deputy" — "standing or acting for another or others."
Webster's Third New International Dictionary defines the word as "standing for or in the place of another: acting for another or others, constituting the agent for another esp through delegated authority." At another point Webster defines a representative as "one who represents another or others in a CT Page 12273 special capacity. . ."
Blacks Law Dictionary defines "representative" as: "one who represents others or another in a special capacity, as an agent, and term is interchangeable with agent."
There is nothing about these definitions however that would seem to allow the court to conclude that a "retiree" could not be a "representative" of IRI Member companies for Article 9 arbitration.
(a)
But HSB maintains the word "representative" is ambiguous and in its reply brief the plaintiff disparages reliance on dictionary definitions to interpret contract terms. Regarding the interpretation of contracts three general principles govern: (1) the intention of the parties controls and is gathered from the language of the contract in light of the circumstances surrounding the parties at the execution of the contract; (2) the language must be given its ordinary meaning unless a technical or special meaning is intended; (3) the contract must be constructed as a whole so that effect is given to every part if reasonably possible, Ingalls v. Roger Smith Hotels Corporation, 143 Conn. 1,6 (1955), Hatcho Corp. v. Della Pietra, 195 Conn. 18, 21 (1985). Also see Williston on Contracts at Volume 4, § 607, page 378.
 ". . . where the parties have assented to a writing as an expression of their agreement . . . the standard of interpretation is the standard of limited usage, that is, the ordinary meaning of the writing to parties of the kind who contracted at the time and place where the contract was made and with such circumstances as surrounded its making."
Also see § 202 of Contracts (Second) Restatement which at subsection (3) says in part
"(3) Unless a different intention is manifested.
 (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning; . . .
It is fair to say that using the generally prevailing meaning of the word representative a retired CEO or senior management official of a Member Company could be considered to fall within CT Page 12274 the definition of "representative." Given the purposes of Article 9 one could hypothesize certain individuals who could not be considered "representatives" under any circumstances — people with obvious conflicts of interest, particularly unsavory backgrounds etc. But that does not make the word ambiguous and deprive it of a core meaning which the Loss Committee could reasonably ascertain in discharging its duties and which certainly would appear to include "retirees" having the background set forth in the procedures adopted in October 1993. Contract interpretation according to the rules of ordinary language usage would be inoperable as an aid to the courts and contracting parties if the hypothetical existence of certain individuals or entities not covered by a general term rendered that term ipso facto ambiguous.
But HSB presses its argument for ambiguity on several fronts. It points to older Connecticut cases, Safford v. Morris MetalProducts Co., 97 Conn. 650, 653 (1922); Volk v. Volk Mfg. Co.,101 Conn. 594 (1924); Maltby v. Associated Realty Co.,114 Conn. 283 (1932) for the proposition that in interpreting the word "representative" in Article 9 the court should look to the "practical construction" put on the word by the Loss Committee over the years. HSB did present evidence through Mr. Rogers who attended Loss Committee Meetings for 14 years and Chairman Troske who has served on the Committee for eight years that no retiree has served on an Article 9 panel in their experience. Mr. Troske said one such person might have served but could not remember who that individual was or identify the panel he or she might have served on. The Court can conclude that no evidence has been presented that retirees have served on these panels for the mentioned periods. But Volk which Maltby relies on says at pages 600-601 in referring to contractual language:
 "Since the meaning is doubtful, the law admits evidence of the practical construction of this contract by the words, acts and conduct of the parties. Such evidence, in cases of doubtful construction, is strong presumptive evidence of the intention of the parties that the contract should be construed in accordance with their own practical construction." (emphasis added)
 Safford is not that helpful because the "practical construction" put on the alleged contract by the plaintiff appears to involve issues of detrimental reliance, 97 Conn. at p. 651 and p. 654. CT Page 12275
In any event these cases are not authority for the proposition that contract language which is not ambiguous can be rendered so by "practical" construction. In other words if in fact it is true that under the ordinary meaning analysis of the word "Representative" a retiree could be appointed to an Article 9 panel of what significance is the fact that for one reason or another there is no proof that that was the practice for the past 14 years. Article 9 was part of an original treaty or understanding between member companies and the predecessor to IRI that dates back to 1975. Am I to hold that an after the fact ambiguity exists in contract language because although in 1975 the word "representative" could be taken to refer to current employees or retirees, for a portion or perhaps even all of that time retirees were not in fact chosen? Does that mean that where a contract gives a range of options to a party at the time of contract formation that party runs the risk of being foreclosed from exercising one or another of those options merely because in the past it had not chosen the option which it now desires to exercise?
If in fact under Article 9 the Loss Committee had the option to select a retiree but historically did not do so now can that be said to foreclose the right of the Committee to select a retiree for the present or any future panel? HSB has not shown any detrimental reliance because of a pattern established by the Loss Committee of not appointing retirees.
Or to put it another way there is nothing in this record to permit the court to conclude that HSB has made a viable claim that there is something about retirees as such or what they could or could not bring to these panels which HSB was aware of and relied, upon over the years so as to support a credible claim of contractual expectation that retirees as such would not be appointed.
Mr. Kelly testified for HSB, he was head of the law department until he retired. He offered reasons why he felt that retirees should not serve on Article 9 arbitration panels but did not base his contractual expectation on any past history of the failure to appoint retirees to Article 9 arbitration panels.
(b)
HSB also pursues its ambiguity argument by referring to CT Page 12276 positions taken by Mrs. Trump and Maser, members of the Loss Committee and Mr. Morris who is an attorney in the legal department of Mr. Maser's company regarding the meaning of representative. Mr. Maser and Mr. Morris seem to accept a fortiori that retired executives could be appointed to a Phase II arbitration panel. This is apparently consistent with Attorney Morris's observation in his March 18, 1993 memorandum to Mr. Maser that: "The Committee should look for those individuals with the greatest level of expertise and the least amount of bias or personal stake in the outcome." Mr. Maser in his March 29, 1993 letter to Mr. Rogers said "while there appears to be no requirement that representatives of carriers be either current or retired employees . . . for both Phase I and Phase II I would recommend that we seek people familiar with the industry and its customs and practices."
Mr. Trump in his May 13, 1993 letter to Mr. Rogers uses the word "employee" but his main point would seem to be that Article 9 didn't exclude "outsiders" from service as representatives and in this respect he differed from Morris and Maser. Interestingly in the materials he prepared for an October 1991 presentation to an industry association he refers at page C-14 to the use of "single arbitrator" and seems to frown on tri-partite arbitration preferring a single arbitrator who should be an "active" or a "retired insurance industry executive with substantial experience" in the type of arbitration the group he was talking to apparently was involved with.
HSB seems to suggest that the fact that Maser, Trump, and Morris had different notions about "outsider" participation on these panels underlines the fact that the word "representative" is ambiguous. Thus the court should look to past practice and practical construction to define the word "representative" and that practice did not include the appointment of "retirees".
This argument I believe gets to the nub of the difference between these parties regarding the issue of contract interpretation. On the one hand IRI wishes to give a liberal reading to the word "representative" which would include a broad variety of people with perhaps little or no limitation on whom might be selected. This is especially important from the perspective of IRI in light of the decision issued by the court earlier in this case which might encourage member companies involved in future arbitration to run to court whenever the Loss Committee selects someone who doesn't comport with their notion CT Page 12277 of the ideal arbitrator. Thus any attempt to define "representative" or defend the appointment of "retirees" as a reasonable interpretation of "representative" would open up the Pandora's Box of ambiguity.
On the other hand HSB notes that "representative" is no where explicitly defined in the Treaty; a retiree could or could not be a "representative". Furthermore there is nothing about the word that dictates either interpretation. Thus there is ambiguity and we look to past practice and practical construction to define the word.
I have trouble with both approaches. They focus solely on the word "representative" as a word used in the four corners of the agreement seemingly isolated from the purposes of the agreement. The point of this treaty or agreement between the member companies is that the Loss Committee picks the representatives. Given the purposes of the treaty, the usages and circumstances of the reinsurance industry the question becomes can this court hold that it would not be a reasonable exercise of the Loss Committee's power to appoint as "representatives" "Current or former CEO's or senior executives."
In Contracts Calamari and Perillo (3d ed.) there is an illuminating discussion in Sections 3-11 and 3-12 of their work, pp. 168 et seq. which sets forth the two views on I ways to interpret a contract. They note that "Williston's standard of interpretation is the meaning that would be attached to the integration (integrated contract) by a reasonably intelligent person acquainted with all operative usages and knowing all of the circumstances prior to and contemporaneous with the making of the integration", id. at p. 168; see Williston on Contracts, Volume 4, § 607.
Williston cites what he calls a leading case, PacificPortland Cement Co. v. Food Machinery Chemical Corp., 178 F.2d 541
(CA 9, 1949) which at various points said:
 "It is the aim of the courts, in interpreting a written contract, to give effect to the mutual intention of the parties as it existed at the tune of the execution of the contract. . . . In applying this norm courts will interpret words in the sense in which they are ordinarily used, except when they are used in a special or technical sense." CT Page 12278
The court went on top say that:
 "The standard is what a normally constituted person would have understood them (the words) to mean, when used in their actual setting . . . some illustrations . . . may serve to indicate how these principles are applied to particular situations. The word `children' as used in the beneficiary clause of an insurance policy may be interpreted to include illegitimate children although the technical common law meaning of the word excludes illegitimate children."
As Calamari and Perillo note in Sec. 3-12 of their work Corbin takes a more liberal view, The Interpretation of Words andthe Parol Evidence Rule, 50 Cornell LQ 161. For Corbin "all relevant extrinsic evidence is admissible on the issue of meaning including evidence of subjective intention and what the parties said to each other with respect to meaning. This is true even if there is an integration and there is no ambiguity", id. at p. 171. But even Corbin confines himself to the time of contract formation and as noted at page 172 of the Calamari work "tempers his more liberal rules" by accepting the fact that the trial judge has to initially decide if the asserted meaning — here that of the word "representative" to include "retiree" — is one "to which the language, taken in context, is reasonably susceptible in the light of all the evidence, see Brobeck,Phleger Harrison v. Telex Corp., 602 F.2d 866, 871, (CA 9, 1979).
Mr. Kelly headed the law department of HSB when this dispute developed. He testified that Article 9 should be read as not permitting the appointment of retirees. Basically he seemed to say an active employee of a member company would face internal pressure if someone were to question how he or she ruled on an award. An active employee would have to live with the results of any award in a much more direct way than a retiree. Also boiler and machinery representatives are on the panel to bring to the panel that industries point of view and active employees could do this more effectively than retirees. These are interesting remarks but they say nothing about the experience and disinterestedness in terms of reaching a fair result that could be more reasonably be said to be the hallmark of a person best suited to be an arbitrator. In fact since under Article 9 HSB has the right to appoint a representative of its choice or 20% of the panel, Mr. Kelly's reasoning and his perception of the possible pressures on active employees leads the court to conclude that CT Page 12279 the Loss Committee was not giving an unreasonable definition that departed from ordinary usage to the word "representative" — it is a definition that fits into the context of the agreement.
Apart from the speculation of Mr. Kelly there has been no evidence presented that retirees with the indicated qualifications could not be reasonably said to be "representatives" as defined in the agreement between the parties. The opposite is indicated in the Maser and Morris observations and in the attachment submitted by Mr. Trump. There is also nothing to indicate the word was used in a technical sense to exclude retirees. In the reinsurance industry at large Mr. Morris indicates retirees are appointed to these arbitration panels, cf. L.A. Lockwood Jr., Inc. v. E. Gross Co.,99 Conn. 296, 306 (1923); Sotto Santo v. Lucas, 108 Conn. 521,522 (1928). Also even the past practice and practical construction arguments are at least somewhat belied by the fact that despite this past history of not appointing retirees Mrs. Maser, Morris, and Trump didn't feel foreclosed from suggesting that such people, if qualified, be appointed.
(c)
As might be gathered from the previous discussion I have a problem with the HSB position on a more basic level. Even if the word "representative" in Article 9 can be said to be ambiguous on the issue of whether or not a retiree could be a representative, how far does that really go to support the HSB position that a retiree cannot be appointed strictly from the point of view of interpreting this contract language? It has been held in our state that: "If the terms of the contract are fairly susceptible of two or more interpretations, the one which is the more equitable, reasonable, and rational is to be preferred," Lanna v.Greene, 175 Conn. 453, 458-459 (1978), Texaco Inc. v. Rogow,150 Conn. 401, 408 (1963), Game-A-Tron Corp. v. Gordon,2 Conn. App. 692, 694-695 (1984).
I realize that HSB has serious objections to the manner in which Article 9 procedures were adopted and the method by which the panel members were chosen. I understand that part of their argument can be taken to suggest that a panel member who was a retiree was in effect chosen by IRI staff and outside counsel and that the staff and counsel changed the interpretation of Article 9 to include retirees so that this person could be appointed to the panel. I will attempt to deal with these issues shortly. CT Page 12280
However, these issues are analytically distinct from the issue of contract interpretation I am now addressing. As a strict matter of contract interpretation and for the reasons previously stated I believe that the more "equitable reasonable and rational" interpretation of the word representative would be such that it included "retirees" with the qualifications and background established by the procedures adopted by the Loss Committee.
Also even if one were to say that the conditions for the operation of certain ameliorative rules of contract interpretation were established — read the contract against the drafter, superior bargaining power, fiduciary duty — here these factors would not appear to aid the HSB position in the strict matter of contract interpretation I'm now addressing. HSB is one of numerous companies affected by Article 9 and any interpretation a court might give to it. HSB in this case properly but necessarily speaks for its own particular interests. In this context I do not believe it is appropriate to apply ameliorative rules of contract interpretation to give HSB a particular advantage in this litigation when I can't say in a general sense that interpreting "representative" to bar retirees would be a rational way to interpret the word as it applies to the interest of other companies covered by this treaty.
(d)
There is another aspect to the HSB argument on this score, however, that must be dealt with. In the earlier opinion of the court at 12 Conn. L. Rptr. 464, 467-468 (1994) I said:
 "What the court is saying then is that in addition to cases where there are claims of overt acts of bias and collusion on the arbitrations part, in the narrow case where it is claimed the arbitrators were not chosen in the specific manner agreed to by the parties, the resolution of that claim is a jurisdictional one which the courts should decide before the arbitrators hear the case on the merits."
As a reason for arriving at this conclusion I had earlier said that one of the primary reasons people and companies agree to arbitration is:
. . . "to secure as arbitrators people who are skilled and CT Page 12281 experienced in the problems of a particular industry. It is felt that these individuals would be able to bring more knowledge and expertise to the resolution of complicated disputes that may arise. . . . It would be completely disruptive of the arbitration process in such industries and have a deleterious effect on the decision to enter into arbitration agreements especially as they deal with methods of selecting arbitrators, if a party claiming that the agreed upon method had not been followed, could not get relief in court."
According to the terms of this agreement the Loss Committee selects the Phase II panel members. I have concluded that the agreed upon method of selecting arbitrators was not violated by the mere fact that retirees were appointed. That is, the Loss Committee could have selected employees of member companies or retirees. But the agreed upon method of selection was that the Loss Committee would make the selection.
Part and parcel of that selection process was that the Loss Committee would be deciding if such people could be retirees of member companies. If in fact the Loss Committee didn't effectively decide retirees could be panelist as expressed by the act of appointing retirees but for all intents and purposes let the IRI staff make this decision then HSB didn't get what it bargained for and the decision to appoint retirees must be held to be improper. The adoption of procedural rules allowing the appointment of retirees according to this view was really an IRI staff decision and part of a larger scheme to get panelists favorable to IRI on the panel.
Relative to these claims certain facts have been established by this record. At the time of the events that are relevant to a resolution of this matter Mr. Tuttle was general counsel to IRI and Mr. Rogers was vice president of claims for IRI. The unusual and perhaps byzantine nature of the problem before the court is reflected by the fact that these men attended meetings of the Loss Committee on a regular basis. HSB doesn't appear to contest the propriety of this practice although it could be argued I suppose that the IRI staff secured some kind of advantage for example by the mere fact that it learned at the March 11, 1993 meeting that the Loss Committee was going to begin work on establishing the appropriate criteria for the selection of panel members. I agree with HSB that there is nothing explicit in the record to indicate that the Loss Committee knew on March 11, 1993 that the IRI staff and outside counsel would be working on the CT Page 12282 drafting of procedures for this arbitration. But what on earth did they think when at that meeting Mr. Troske, the Chairman, said send any of your suggestions on these procedural matters to me, Mr. Rogers or Mr. Tuttle? What would be the purpose of this suggestion other than a recognition of the fact that Rogers and Tuttle would in some manner be assisting in the drafting of the arbitration procedures.
HSB is correct in pointing out that Mr. Tuttle became IRI staff counsel in 1987 and during his tenure he had not drafted the procedures for any of the three Article 9 arbitrations that preceded this one. But historically there is nothing to indicate that the Loss Committee had considered and rejected the notion that the IRI staff could have a hand in formulating procedures for Article 9 arbitration. Exhibit 110 is a redacted copy of the June 5, 1984 meeting of a Loss Committee Meeting. The IRI staff proposed procedural rules applicable to Article 9 arbitration. What do the minutes say?:
 "The Committee expressed a concern that the proposed rules created a too structured procedural format for conducting Association-Member Company arbitrations. It was suggested that staff redraft the rules and report back to the Committee at a later date." (emphasis added)
Mr. Rogers in his January 6, 1995 testimony said the Loss Committee in rejecting the 1984 proposed rules just decided not to adopt rules that would affect all Article 9 arbitrations: "They would look at the arbitration and in the process of appointing the panel then would also then make a decision whether they ought to suggest procedures peculiar to that arbitration. . ." (1/6/95, P. 74). Due to the nature of the controversy to be arbitrated here and the amount of money involved the record is replete with indications that the peculiar importance of this arbitration might require special procedures. Under I this Treaty IRI could become involved in numerous Article 9 procedures with member companies so it is a fine line to draw to say that it is acceptable for IRI staff to draw up for Loss Committee approval procedures to be generally applied to all Article 9 arbitrations but improper for it to present such procedures after a particular dispute.
The real thrust of the HSB argument seems to be that it was improper for IRI staff and outside counsel to draw up the procedures for this Article 9 arbitration because in this CT Page 12283 particular case both their creation and adoption was delegated to the IRI staff and outside counsel. This is related to the general position of HSB, soon to be discussed, that the Loss Committee in effect delegated its contractual responsibility to select the panel for this arbitration to its adversaries — the IRI staff and its outside counsel — and the procedural rule change allowing the appointment of retirees facilitated that goal. What has the evidence established as to this issue?
Although HSB has raised issues that cause concern, to the court at least the questions it raises about the adoption of the Article 9 procedures concerning eligibility for the panel are not that easy to credit. What does it really mean to say IRI staff and outside counsel "drafted" these procedures? Does it mean those individuals were responsible for creating them and the Loss Committee merely rubber stamped the procedures including the qualification standards which indicated qualified retirees could serve? If the Loss Committee merely had IRI staff draw up suggestions or implement ideas regarding procedure received from Loss Committee members and then independently decided whether or not to accept what the staff prepared how would that be improper?
The plaintiff at page 102 of its April 7, 1995 post hearing brief seems to concede what the court concludes that the preponderance of evidence failed to establish that the Loss Committee rubber stamped procedures drawn up by the IRI staff and outside counsel which permitted the appointment of retirees. There the brief says: "Acting alone or in conjunction with the assistance of HSB's adversary, the Loss Committee changed its own interpretation of the word "representative. . ." As noted there's historical precedent for the Loss Committee to review IRI staff proposals concerning Article 9 procedure, reject their suggestions and tell them to try again — that happened in 1984. It would be difficult to argue some sort of a conspiracy existed between the Loss Committee and the IRI staff to do in HSB on this matter since HSB acknowledges that the Loss Committee didn't know IRI staff and outside counsel were drawing up the procedures at the time they were adopted. Assuming a fiduciary relationship existed between the Loss Committee and HSB and the Loss Committee knew or should have known of the staff's involvement, PacelliBros. v. Pacelli, 189 Conn. 401, 408-409 (1983) that observation begs the question because the question is what does this record show about whether or not these procedures were the brain child of the IRI staff and whether they were rubber stamped by the Loss Committee and imposed on HSB at the October 1993 meeting where CT Page 12284 they were adopted.
At the March 1993 Loss Committee Meeting one doesn't get the impression the Committee perceived its role as purely passive and bound to approve anything that was proposed to it. Chairman Troske specifically asked members of the Committee to send in their suggestions concerning Article 9 procedure to him and Mrs. Roger and Tuttle. Two Loss Committee members, Maser and Trump did so. Mr. Maser sent along a memo prepared by an attorney on his staff which in fact contains reasons as to why retirees should be appointed. The attachment to his letter sent by Mr. Trump and previously referred to at page C14 also offers views of qualifications for an ideal arbitrator — experience and lack of self interest. Qualities at least as true if not more true of retirees as opposed to even current employees. No evidence was presented through Mr. Troske, any other Loss Committee member, or any IRI staff present at the October 1993 meeting of the Loss Committee that adopted these procedures that little or no discussion preceded or accompanied the adoption of these procedures. No evidence was presented that outside counsel and IRI staff in writing up those procedures were even doing anything more than following up on ideas presented by Maser, Morris, or Trump.
The notion that IRI staff and outside counsel seized the opportunity to draft procedures so that they could secure the appointment of certain "retirees" and that would advance their cause against HSB doesn't bear much scrutiny. Mr. Buckley who was chosen for the panel is a retiree now but wasn't one when chosen. Mr. Birigana was a retiree when chosen but he was interviewed in May 1993 over a month after IRI staff got input from Mr. Maser and Morris that retirees perhaps ought to be appointed to the panel. Outside counsel, Mr. Voebel, told Birigana that the Loss Committee would have to consider whether the fact that he was a retiree would preclude his appointment to the panel. Mr. Tuttle testified that when he drew up the qualifications for panel membership in Sections B1 through B4 of the procedures he didn't know whether the Loss Committee had even appointed a retired person to an Article 9 arbitration panel. All of this doesn't have the ring of conspiracy or a concerted effort by IRI staff and outside counsel to get a retiree of their choice on the panel. As the IRI brief notes Birigana serves as a representative of a non boiler and machinery company — his appointment could hardly serve to dilute the boiler and machinery point of view. CT Page 12285
What is really lacking in the position that the procedure adopted permitting retirees to be appointed was aimed at advancing IRI's cause in the arbitration and was foisted on the Loss Committee with that purpose in mind is the absence of the requisite evidentiary link which was within HSB's capacity to develop at the hearing on this matter.
No evidence was presented why retirees in general or Mr. Birigana in particular would be favorable to the IRI position. No cross examination of Mr. Voebel was conducted as to why Birigana was interviewed as opposed to anyone else on the master list Mr. Voebel helped compile or whether in compiling the list he chose people he thought favorable to the IRI position or whether he thought retirees in general or certain retirees would be more favorable to that position than other current employees and if so why he believed these things to be true and how it affected his compilation. The HSB brief argues retirees were included on the short list of eight prospective panel members given to Mr. Troske in January 1994 only after Mr. Voebel and Tuttle had formed impressions of them after interviewing them. But the April 5, 1993 list of 23 people contained the names of two retirees several weeks before the interviewing began but a few days after Mrs. Maser and Maser recommended the possibility of putting retirees on the panel. So it is difficult to argue that the procedures were changed to allow retirees to serve on the panel because IRI wanted to have a certain identifiable retiree selected after interviewing them. That is, the question of whether the Loss Committee in effect abrogated its right to chose the panel members and let the IRI staff and outside counsel do so and the question whether interviewing prospective panel members by outside counsel gave IRI an unconscionable advantage are separate questions from the propriety of the Loss Committee's decision to permit retirees to sit on this panel given the contract language in Article 9. On the latter issue I find that the procedure permitting such appointments did not violate the terms of Article 9 nor did the way it was adopted violate that article.
 II (1)
There are additional issues presented by HSB which present difficult problems. HSB claims that the actions of the Loss Committee and the IRI staff violated its contractual rights under CT Page 12286 Article 9. That article defines how the panel is to be made up and who selects the panel. HSB maintains the process by which prospective panelists for the Phase II arbitration were chosen was improper. IRI staff and its outside counsel selected the universe of people to be considered and then narrowed that group of people down to a short list in part by means of an interviewing process conducted by outside counsel.
Article 9 simply says the Loss Committee shall appoint the panelists it does not explicitly address how the process of selecting prospective panelists for consideration by the Loss Committee is to be conducted nor who is or is not to have input into that process.
Before the discussion begins one observation should be made. This is not a case where HSB is asking a court to exercise its equitable powers in one way or another to preserve the integrity of the arbitration process. Thus although the FAA does not explicitly provide for removal of arbitrators federal and state courts acting in equity can remove biased or corrupt arbitrators prior to the commencement of arbitration. Rather its complaint indicates and the prior decision of this court confines the scope of the court's decision to the question of whether the arbitrators were chosen in the specific manner agreed to by the parties. The decision turns on "questions of compliance with the particular contract provisions of this case and the rather mechanical question of whether arbitrators who have been appointed were appointed in accordance with the agreement to arbitrate," 12 Conn. Law Rptr. 464, 467, 486.
First the language of Article 9 will be examined m a purely literal sense. Article 9 section B is quite clear — Phase II panel members "shall be appointed by the Standing Loss Committee." In its claim of contract violation by the Loss Committee HSB seems to be relying on an alleged fiduciary duty the Loss Committee owed to HSB and a duty to act in utmost good faith with regard to the panel selection process. Yet at points would also appear, although it is not absolutely clear at least to the court, that the argument is being made that the provisions of Article 9 were violated because for all practical purposes, because of the selections process used here, the Loss Committee didn't appoint the four people finally chosen for the panel but the IRI staff and outside counsel made the appointments. The choice made by these latter mentioned people was in effect rubber stamped by the Loss Committee; the Loss Committee didn't CT Page 12287 "appoint" the panelists they acquiesced in the decision made by the IRI staff and outside counsel. This argument can be analyzed from two perspectives. First did the Loss Committee knowingly and intentionally acquiesce in choosing panelists that IRI staff and outside counsel had selected. Secondly because of the machinations of the latter parties was the same result accomplished unbeknownst to the Loss Committee and without its complicity. If either proposition is accepted it can be argued that the Loss Committee didn't "appoint" these panelists by any acceptable definition of the term.
There is no support in the record for the proposition that the Loss Committee appointed panelists who it knew that IRI staff or outside counsel wished to be selected. In fact early on in the process members of the Loss Committee gave to the IRI staff names of people who it was felt ought to be considered for appointment. The HSB argument focuses on a so-called "short list" of prospective panelists prepared by IRI staff and outside counsel.
At the Loss Committee meeting of January 19, 1994 Mr. Troske presented seven names of people who were willing to serve on the panel. I believe I can gather from this record given the companies they represented and their positions that each of these people had a substantial place in the insurance industry with a wealth of experience and that would have been known to members of the Loss Committee who had similar credentials. Prior to this meeting a list prepared by outside counsel had been delivered to Mr. Troske's office but there is nothing to indicate to him that it came from that source as opposed to the IRI staff. The Loss Committee prioritized the people to be chosen in the same way they had been prioritized on the list. Plaintiff HSB points out the mathematical probabilities of that randomly happening are not very great — the odds are 5039 to 1. The usefulness of mathematical probability references are not very helpful in this context, however, since they posit consequences in an abstract setting. Once a human variable is introduced they are of little or no use and can be misleading. In other words, although it was not completely developed how this meeting progressed and the reasoning process used by the members to make their prioritization, Troske had the list, it is not questioned that he mentioned all seven names, one name had to follow another in a progression, it is as likely as not that he would have mentioned the names in the order that appeared on the list either from memory or having the list at hand. Since all the people mentioned were noted to be qualified, it does not indicate a naivete to the CT Page 12288 possibility of conspiracies in life to say that these experienced, CEO type people on the Loss Committee, presumably knowledgeable about upper echelon executives in their industry, would have said let's pick the first four. More basically I find it difficult to accept the innuendo of complicity which is the only basis on which the mathematical probability observation can be considered relevant. This is so because the HSB brief itself is replete with statements to the effect, which the court agrees with, that certainly the Loss Committee and in all likelihood Mr. Troske did not know about the activities of Attorney Tuttle, IRI counsel, and Attorney Voebel, outside counsel, in the panel selection process, see pages 33, 41 60, 61, 62, 63 64 65 69, 70, HSB Post Hearing Brief of 4/7/95. There is simply no credible evidence that there was an intentional acquiescence by the Loss Committee in selecting panelists HSB's adversaries wanted on the panel at the time they prioritized the four candidates at the January 1994 meeting or up through the point in February when all these people expressed their willingness to serve.
Much the same observations are applicable to the argument that despite the lack of proof of any intentional acquiescence by the Loss Committee in selecting panel members the IRI staff and its outside lawyers wanted, it still can't be said the panel was appointed by it. That is, the machinations of HSB's adversaries insured that the four people in fact, appointed would be appointed. First there is no credible evidence that Mr. Voebel prioritized the first four names on the list he prepared for any ascertainable reason. If that's so, what real difference does it make that the Loss Committee gave the same prioritization. Besides there were seven names on the list and only four were appointed from it — the Loss Committee ensured that that happened by its own choice. Giving a literal reading to Article 9, the only bargain HSB struck was that the Loss Committee would appoint the four panelists. It did, four had to be picked, seven names were submitted, the Loss Committee exercised choice within the universe of seven names before it — that's enough to satisfy compliance according to a literal reading of this contract.
(2)
HSB cannot base its argument on a literal reading of Article 9, it must bring other rules of contract interpretation into play and other doctrines purportedly affecting the proper interpretation of contracts in the arbitration setting. CT Page 12289
It is worthwhile to review what is not being claimed here. HSB does not claim and has offered no evidence to establish or even suggest that the four panelists chosen by the Loss Committee are in fact biased or prejudiced against HSB and in favor of IRI as a result of the actions of IRI staff, outside counsel or the Loss Committee which HSB now maintains violated its contractual rights.
HSB argues that despite the fact that Article 9 does not explicitly refer to the method by which prospective Phase II panelist are identified and presented to the Loss Committee for actual selection to the Article 9 panel, in fact the process by which that was done here must be held to violate HSB's contractual rights and/or expectations because (1) the Loss Committee in condoning, permitting or perhaps failing to ascertain what that process was broke its obligations as a fiduciary to HSB and/or its duty to act toward HSB in the utmost good faith and/or (2) the IRI staff in conducting that process itself and with outside counsel breached its contractual obligations of good faith and fair dealing.
Taken to its logical conclusion I suppose, to prevail here HSB would not have to show that the panel actually selected was selected in such a manner so that it in fact would be biased toward the IRI position. HSB would only have to establish that the particular process used gave the opportunity for its adversary to select a panel favorable to itself, therefore the process cannot be contractually condoned, therefore this panel cannot arbitrate this dispute. Before the legal theories are discussed the evidence must be reviewed further.
What has the evidence shown regarding HSB's position concerning the panel selection process? It has been shown that Attorney Voebel, outside counsel, began collecting names for potential panelists in March 1993. He published a written list of potential panelists in early April. Mr. Voebel and IRI staff counsel, Mr. Tuttle, decided to interview specific candidates. Attorney Voebel used a Mr. Heifitz and a Ms. Hentges as contact persons to set up the interviews and several interviews were conducted by Attorneys Voebel and Tuttle. These lawyers decided not to consider as panelists representatives of The Home, The Travelers, and Chubb. They decided not to interview candidates suggested by Mr. Trump, a member of the Loss Committee. They decided that the retired status of three individuals was a disqualifying factor for selection on the panel.[2]
CT Page 12290
Attorneys Voebel and Tuttle then prepared a "short list" which narrowed the pool of possible panelists to seven and listed the names in order from one to seven. The Loss Committee then gave the same prioritization in the order of names as the Voeble-Tuttle short list in their January 19, 1994 meeting. The first four people on the list were then contacted by Mr. Troske, Chairman of the Loss Committee, and they agreed to serve on the Phase II panel.
Early on in the process Mr. Trump wrote a letter to IRI staff which HSB argues gave the staff a blank check to select as panel members whomever they wanted. I cannot agree with the HSB interpretation of the letter which was sent to Mr. Rogers. The first sentence references the March 11, 1993 Loss Committee meeting and "your solicitation for comments." IRI staff regularly attended these meetings and in this context it is clear Mr. Trump was responding to a request of the Committee. Mr. Maser was at the same Loss Committee meeting and received the same "solicitation for comments." His letter of March 29, 1993 to Mr. Rogers and the attachment of Mr. Morris he sent along with, it are clearly addressed for the consideration of the committee. Mr. Morris concludes his memorandum by saying "these are the major considerations for the Committee." The Maser letter itself is replete with references as to what the Committee should or should not do. At another point the Trump letter says "a white glove procedure is essential as I believe a potential appeal of the process is possible." He refers to the preparation of resumes. All of this doesn't sound like an indication that when he later said "you should have the opportunity to select association members at will" he was imposing carte blanche power on the IRI staff to select any panelist they wanted. How would that be a white glove procedure? Who were the resumes being prepared for if not for the Committee and why would they need them if the Committee selection of panelists was just going to rubber stamp the IRI selection? The use of the word "you" just reflects the confusion inherent in the IRI structure — the Loss Committee is part of that structure, so obviously the staff, and the staff attends Loss Committee hearings. Besides the HSB interpretation is belied by the fact that Mr. Trump soon acted at cross purposes to the HSB interpretation of his letter because he himself provided names of possible candidates. Also he apparently kept his views in pectore since there is no evidence the Loss Committee knew of IRI staff involvement in the panel selection process on January 19, 1994 except perhaps for Mr. Troske and CT Page 12291 certainly no evidence any Loss Committee member knew of the interviewing of prospective panelists on that date.
Also during the presentation of evidence in this matter there was no evidence presented to counter Mr. Voebel's assertions that the original pool of people he listed was prepared for any other reason in mind than to select qualified people as opposed to being chosen because they would be likely to favor IRI's position over that of HSB. Attorney Voebel was acting for his client and would not act to select anyone he thought was adverse to his client's position but there was no actual evidence he or Attorney Tuttle kept anyone off the first list or the short list based on these considerations. That is, no cross examination of Voebel or Tuttle was aimed at proving and no evidence was presented showing that the original list of 23 people prepared by Attorney Voebel excluded people otherwise qualified for reasons having to do with considerations of disadvantage to IRI, or that the short list culled from those names was narrowed down based on that consideration or that Mr. Trump's candidates weren't interviewed with that motive in mind. There was no evidence presented that contradicted Attorney Voebel's testimony that the interviews of the prospective candidates covered anything more than their willingness and availability to serve or even that based on these interviews Voebel and Tuttle decided to put people on the short list because the interviews indicated they, would be favorable to IRI's position or exclude anyone that was unfavorable.
In the spring of 1994 Mr. Kelly wrote to Chairman Troske a series of letters in which he raised numerous concerns about IRI staff involvement in the panel selection process. By the end of March at least Mr. Troske knew of that involvement and I believe was not very forthcoming in sharing that knowledge. But the tone of the Kelly letters indicates that an adversarial position was being taken between HSB and the Loss Committee. No matter how appropriate or inappropriate Mr. Troske's and the Loss Committee's response to Mr. Kelly's concerns was the point is that the issue before me is the selection of the four panelists. The prioritization for that was done on January 19, 1994 and they agreed to serve by the end of February 15, 1994. Mr. Kelly's first letter concerning the selection process was dated February 7. That letter post dated the January 19, 1994 prioritization by the Loss Committee and predated the Loss Committee's and Mr. Troske's knowledge about the full nature of the selection process that had been conducted. CT Page 12292
(i)
As to the two legal theories advanced, HSB begins its argument by noting that this court said in its earlier decisionVolt Information v. Board of Trustees, 489 U.S. 468, 478 (1989) is the controlling case. Volt holds that courts must enforce privately negotiated agreements to arbitrate just as they would other contracts in accordance with their terms and as the court further noted in this regard "the interpretation of private contracts is ordinarily a question of state law", id. p. 474. Our state has taken a position similar to that of Volt, see Marsalav. Valve Corp. of America, 157 Conn. 362, 365 (1989).
HSB then cites several cases standing for the unimpeachable proposition that the meaning of a contract "depends upon the intention of the parties", First Hartford Realty Corp. v. Ellis,181 Conn. 25, 33 (1980), also see Hatcho Corp. v. Della Pietra,195 Conn. 18, 20 (1985), Paine Webber v. American ArbitrationAssociation, 217 Conn. 182, 189 (1991), A. Dubriel Sons v.Lisbon, 215 Conn. 604, 608 (1990). This general statement is not helpful because it necessarily follows that a court interpreting a contract must ask itself where do I begin, where do I go to find out the intention of the parties. A court goes to the language of the contract. See A. Dubriel Sons Inc. v. Lisbon
where the court spent several pages ascertaining what could be deduced as to the intent of the parties when they crossed out the word "shall" in an arbitration provision and substituted the word "may", 215 Conn. at pp. 609-613. A. Dubriel at page 608 cites theHatcho Corp. v. Della Pietra case which at 195 Conn. at p. 20
said that in interpreting a lease which is a contract "the intention of the parties is controlling and must be gathered from the language of the lease in light of the circumstances surrounding the parties at the execution of the instrument" and that "the language must be given its ordinary meaning unless a special or technical meaning is clearly intended." A special or technical meaning must be in the minds of both parties and/or established as a standard industry practice and not represent the wish list or understandings of one of the parties or there can be no contract formation or meeting of the minds which is not the specific claim made here. If we look at the words of Article 9 — the operative contract between the parties — it says the Loss Committee "shall appoint" the Phase II panel members. I have concluded that giving a literal reading to the contract the Loss Committee did appoint the panel and HSB has not met its burden of proving that the Loss Committee rubber stamped the actual choices CT Page 12293 of the IRI staff or that in making its appointments to the panel it wasn't acting qua Loss Committee but as some kind of automation or even agent in fact of the IRI staff and its outside counsel.
I do not believe it is appropriate to use the claimed reasonable expectations of one of the parties to read an intention into contract language which is not warranted by the ordinary meaning of contract language. I don't believe trial courts should rewrite contracts. I have no hesitation about saying courts should decide as a jurisdictional question prior to arbitration whether arbitrators were chosen according to in the specific manner agreed to by the parties. That was the conclusion I reached in my earlier' decision. But in deciding the way I did I did not mean to say that a trial court would have the right to add to or subtract from contract language. If I had to rewrite that decision I probably would refine it by saying that the party making such a claim would have to make out a prima facie case that the arbitrators were not chosen in accordance with the contract.
However, nothing in the position taken here by HSB necessarily disagrees with these observations. It argues rather that a literal interpretation of this contract is inappropriate. HSB points to the words in Article 9 to the effect that the Loss Committee shall appoint the Phase II panelists and maintains those words must be interpreted in light of the Loss Committee's fiduciary obligations to HSB and duty to act towards HSB with the utmost good faith. Also HSB argues that in construing Article 9 and the words in question the court should recognize that a contract imposes on each party a duty of good faith and fair dealing in its performance Central New Haven Development Corp. v.La Crepe, 177 Conn. 212, 217 (1979). HSB maintains this implied contractual duty applies to arbitration contracts, Bernhard v.Rochester German Insurance Co., 79 Conn. 388, 395 (1906). Magnanv. Anaconda Industries, Inc., 193 Conn. 558, 567 (1984) is cited by HSB for the proposition that the implied covenant is essentially "a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." But the following sentence, also of some interest, should be noted: "The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." The court will first discuss the HSB claim based concerning the violation of fiduciary duty and the duty to CT Page 12294 act in utmost good faith by the Loss Committee.
(ii)
HSB argues that the Loss Committee of IRI owed it the duty to act in the utmost good faith in discharging its Article 9 responsibilities because it was a fiduciary as to HSB. It seeks to escape the circularity of an argument that in interpreting contract language a court must look to the intent of the parties given the fact that as noted above the cases look to the ordinary meaning of words in the contract to ascertain intent. HSB appears to seek to do this by focusing on another variation of the intent theme which says that in interpreting the intent of the parties a court should read the operative contractual language "in the light of the whole relationship between the parties", Hess v.Dumouchel Paper Co., 154 Conn. 343. In Ginsberg v. Mascia,149 Conn. 502, 506 (1962) the court said: "That intention is to be determined from the language used interpreted in the light of the situation of the parties." But the circularity dilemma is not really avoided if one examines these cases more closely. Hess
dealt with what the court called an "oral arrangement" between the parties. The court said at two points at page 348-349, the following:
 "Since the subsequent agreements for additional space were not reduced to writing, evidence as to their legal meaning must be found in the circumstances surrounding their making."
 "The contract must be read in the light of the whole relationship between the parties . . . the contractual relationship must be shown by some intelligible conduct, acts and words and not from an unexpressed intention."
The Ginsberg case did of course use the language cited by HSB in the above reference quote but the quote must be placed in context. The full language of the court at page 506 is the following:
 "That intention is to be determined from the language used, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." CT Page 12295
The court went on to note that "the contract was executed under peculiar circumstances", id. p. 506. Both Hess and Ginsberg
involved circumstances of some ambiguity as to what the parties agreed to — in one case because there was an "oral arrangement" between the parties, in the other because the contractual language was somewhat confusing. That's not what we have here given my interpretation of the contract. Furthermore, when these courts use the word "relationship" they talk about the acts, words, and circumstances surrounding contract formation and what might be called actual evidentiary facts as they might bear on what the parties truly intended. "Relationship" between the parties is not used in the sense that is contemplated under doctrines of contract interpretation based on a concern for dominance by one party over another — for example the rules applied to so-called contracts of adhesion or the rules reading language against the drafter.
But these doctrines are not being relied on here nor is there a claim that there is a violation of some important public policy if the words of this contract are given their ordinary meaning.Volt and Marsala make clear that arbitration is a matter of contract between the parties. Except for the rule set forth inMoses H. Cone v. Mercury Construction Corp., 460 U.S. 1, 24
(1983) saying that contractual language must be interpreted so that doubts are resolved in favor of arbitrability (not the issue her), there is no body of federal substantative law permitting a court to rewrite contracts and add language to arbitration agreements to make them comport with the court's notions of fairness. The only contracts the courts will not recognize are ones where one of the disputants is to arbitrate its own cause,Matter of Cross Brown Company, 167 N.Y.S.2d 573, 575 (1957);Graham v. Scissor-Tail Inc., 623 P.2d 165, 175-176 (Cal, 1981). Whether courts stay arbitration when such unconscionable contracts are involved or vacate awards under them, they are not enforcing contract provisions but in effect exercising their inherent equitable power to preserve the integrity of the arbitration process. Similarly courts exercise their inherent equitable powers when they remove an arbitrator before arbitration for actual bias or corruption. Gaer Brothers v. Mott,144 Conn. 303, 307, 309 (1957); Metropolitan Property Cos. v.J.C. Penney Cos., 780 F. Sup. 885, 895 CD Conn. (1991); AstoriaMedical Group v. Health Ins. Plan, 227 N.Y.S.2d 401, 402 (1962).
These observations are what concerns me about accepting the logical consequences of HSB's very well crafted argument. The CT Page 12296 purpose of Article 9 was to achieve arbitration by a body of fair minded responsible people who as representatives of member companies in an industry with technical and complicated rules and understandings as to its proper operation would bring some skill and background to the resolution of disputes. There is no claim made here that the ultimate result of the Loss Committee's Article 9 activities did not produce the end product sought by the contracting parties. HSB has made no challenge to the integrity or ability of the four panelists chosen by the Loss Committee. Under these circumstances how can a court prevent arbitration by this panel under the rubric of contract interpretation when the contract language says nothing explicit about the procedures to be used by the Loss Committee to chose the panel. In effect the court, no matter in what guise the argument is framed, is being asked to exercise its inherent power to uphold what is felt to be the integrity of the arbitration process in a case where that process produced panelists whose integrity and ability has not been challenged.
Yet under cases like Gaer and Metropolitan Property there does not appear to be a basis for a court to exercise its equitable powers to remove these panelists. Gaer says: "Public policy requires . . . that arbitrators not only be completely impartial but also have no connection with the parties or dispute involved which might give the appearance of their being otherwise", 144 Conn. at page 308. No such evidence was offered here and the plaintiff isn't asking the court to invoke its equity powers but to interpret a contract.
In any event wherever the imposition of fiduciary obligations on the Loss Committee might or ought to lead, application of a fiduciary analysis here is a difficult proposition. As the court noted previously the relationship between the Loss Committee and HSB is somewhat difficult to define. The dispute is between IRI and HSB which is one of its member companies. The Loss Committee is a subcommittee or at least answers to the IRI Board of Directors and the Executive Committee of the Board of Directors. One of HSB's complaints is that Chairman Troske of the Loss Committee wasn't completely open with the Executive Committee about Mr. Kelly's complaints since he didn't disclose the Executive Committee IRI staff and outside counsel involvement in the panel selection process. But the IRI Board of Directors and its Executive Committee are obviously part of the IRI and IRI has the dispute with HSB yet the Board of Directors and its Executive Committee runs and is responsible for the operation of IRI. CT Page 12297 Depending on the portion of its briefs examined HSB seems to conceptualize the "IRI staff" and its counsel as outside or separate entities that are the parties who have the dispute with HSB. But IRI staff works for IRI at the will of the Board of Directors and it presumably is authorized to and in fact does hire "outside counsel" to represent its interests. The evidence indicated that in Article 9 arbitrations prior to this one members of the Loss Committee suggested panel members and these were panelists from their own companies. But the boiler and machinery companies form a minority of the member companies in any event. Mr. Rogers also noted that "on occasion" IRI staff would suggest names. The IRI staff has no fiduciary duty to HSB so was the latter procedure improper? Would it only be improper if the Loss Committee adopted an IRI staff suggestion? If IRI staff can compile and submit names or at least has done so in the past how much more improper is it that they used outside counsel. Mr. Tuttle is a lawyer, he was part of the IRI staff, that staff hired other lawyers to assist it in preparing a list of names for Loss Committee consideration. When does all of this become improper — when the IRI staff gives any names to the Loss Committee, when it gives names and any one is chosen, is it improper if not one but two panelists submitted by IRI staff are chosen — perhaps three because that would be a majority of the panel? HSB is a large sophisticated company represented by extremely able lawyers now and in 1993 when there was a settlement as to future arbitration procedures. I'm confident it had able counsel in 1975 when the Treaty containing Article 9 was entered into. How can it be said that HSB didn't know or shouldn't be held to know the nature of the IRI association it was a member of, how it functioned and in what context Article 9 was to operate.
It is difficult to impose a fiduciary obligation on such an evidentiary substructure. Our Supreme Court has said that it has
 . . . "specifically refused to define `a fiduciary relationship in precise detail and in such manner as to exclude new situations' choosing instead to leave `the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'"
 Alaimo v. Royer, 188 Conn. 36, 41 (1982).
Fiduciary relationships are those between attorneys and clients and between principle and agent, Town Country House CT Page 12298Homes Services Inc. v. Evans, 150 Conn. 314, 317 (1963), relations between partners and a partnership; Konover DevelopmentCorp. v. Zeller, 228 Conn. 206, 219 (1994) or between a corporate official and a stockholder; Pacelli Bros. Transportation Inc. v.Pacelli, 189 Conn. 401, 407 (1983). Our court has also held as a matter of law that parties to joint ventures undertake fiduciary duties to each other concerning matters that are within the scope of the joint venture, Electronic Associates Inc. v. AutomaticEquip. Development Corp., 185 Conn. 31, 35 (1981). These and other cases in the same vein are cited by the plaintiff HSB.
HSB puts much weight on Aguinaga v. John Morrell Co.,112 FRD 671, 677-681 (D Kan, 1986) which generally holds unions have a fiduciary duty to union members. In that case workers sued their union and their employer. During the suit they demanded the union deliver over certain documents as to which the union claimed a privilege. The union had originally filed a complaint before the NLRB based on the fact that the company had closed down the plant where the workers were employed. The union then withdrew the complaint as part of an overall collective bargaining agreement. Delivery of the documents turned on whether the union had a fiduciary relationship to its workers.
A close examination of that case, however, indicates why a fiduciary relationship can be found there and why it is much more difficult to find one here. The nature of the fiduciary relationship in Aguinaga was based on the fact that the underlying duty of fair representation a union owes to the worker is based on the worker's relationship or dealings with an entity external to the union — worker relationship, i.e., the worker's relationship to his or her employer. The union's raison d'etre for individual workers is its fulfillment of fiduciary obligations demanded by that factor despite the fact that in negotiating the final agreement with the employer the union may have felt it was negotiating in the interest of all its members including those at other plants not closed.
My understanding of what is involved here is that the reinsurance treaty between IRI and its member companies was to correct a competitive disadvantage in writing insurance that IRI had by permitting IRI to provide policies offering property and boiler and machinery insurance. Article 9 reflects a recognition of the fact that as a result of the reinsurance relationship created by the treaty disputes would arise between IRI as a reinsured and member companies as reinsurers. The very nature of CT Page 12299 the relationship set up by the treaty contemplated a business or competitive relationship between IRI and member companies that might produce disputes involving large amounts of money and divergent financial interest. When HSB acts as a reinsurer of Boiler and Machinery risks insured under an IRI policy how does it even function as a member of the IRI association or how can it be said that in those circumstances IRI and HSB are combining their "property money, efforts, skill and knowledge to seek a profit jointly in a single business enterprise", ElectronicAssociates Inc. v. Automatic Equip. Development Corp., supra,185 Conn. at p. 35? The nature of the treaty and the existence of Article 9 contemplated that a non-fiduciary status may exist between IRI and member companies on certain specified occasions when IRI and member companies enter into certain contractual relationships. That is hardly the characterization or possibility envisaged in fiduciary relationships which have been blanketly described as fiduciary, e.g., lawyer and client partner and partnership etc. Article 9 exists to arbitrate a conflict once it arises; it can hardly be viewed as somehow removing or neutralizing this characterization of a conflict between the parties as a factor that would make it impossible to define the relationship between the disputing parties as fiduciary in nature. For the foregoing reasons I also cannot find that the Loss Committee acted as an agent of the reinsured here and therefore conclude that it had a duty to act with the utmost good faith in selecting this panel. Posing the argument in this way seems to assume that if the utmost good faith obligation is not imposed on the Loss Committee then the court would be permitting the Loss Committee to act on a less than good faith standard. But Volt has to be the circuit breaker to this argument since the only standard the contracting parties are entitled to is the one established by the contract.
From a practical point of view acceptance of the fiduciary or utmost good faith argument to embellish the contractual terms in Article 9 would destroy the viability of the treaty in this rather unique industrial association. As long as the Loss Committee has a role in selecting the panel and approving arbitration procedures any future member company disputants could run into court claiming this or that action of the Loss Committee violated the contract. If such a result would not discourage and defeat arbitration as established by this agreement it would be hard to imagine why not.
That is not what I had in mind in my earlier decision. If CT Page 12300 specific procedures agreed upon by the parties for selecting arbitrators had been violated, if "representatives" had an understood or technical meaning in this industry which excluded retirees, if the Loss Committee had not "appointed" the panelists or in any real sense adopted procedures B1 through B4, I believe the court would have a right to intervene. Absent any of that I won't act as HSB requests when nothing has been shown to me to indicate the panelists chosen are not men of experience and integrity and I'm not being asked to exercise equitable powers but in effect to interpret a contract in such a way that invites courts to create substantive law of fair arbitration procedure.
(iii)
HSB also argues that IRI had an implied duty of good faith and fair dealing to HSB. IRI in this context is viewed as consisting of the Loss Committee and the IRI staff. HSB claims that Article 9 should be construed by the court as having been breached by the activities of the Loss Committee and the IRI staff due to the manner in which the panel was selected.
Section 205 of the Restatement (Second) Contracts says:
§ 205 Duty of Good Faith Fair Dealing.
 Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.
In comment (a) some interesting things are said: "good faith means `honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade'. . . good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness and reasonableness." Interestingly the comment concludes with the following: "The appropriate remedy for a breach of the duty of good faith also varies with the circumstances."
As the plaintiff notes this doctrine has been referred to and adopted by our court in a variety of contractual contexts,Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 395 (1906);Central New Haven Development Corp. v. LaCrepe Inc., 177 Conn. 212,217 (1979); Magnan v. Anaconda Industries Inc., 193 Conn. 558, CT Page 12301 566-567 (1984); Warner v. Konover, 210 Conn. 150, 155
(1989). But the doctrine was not created to give courts a roving commission to enforce their conceptions of fairness.
The Magnan court says at page 567 referring to this concept
 "Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy."
In Konover at page 155 the court refers to a commentator and says:
 . . . "in arm's length transactions, the good faith performance doctrine permits the exercise of discretion for any purpose reasonable within the contemplation of the parties but forbids the exercise of discretion for the purpose of recapturing opportunities foregone at the formation of the contract."
Corbin says at § 541 page 95 that when a court finds that a contract has been made . . . "it will compel performance in accordance with what it believes to be required; by good faith and fair dealing. To this end, the court makes use of processes called interpretation, implication, and construction. . .". At page 97 Corbin gives on to say:
 "In order to prevent the disappointment of expectations that the transaction aroused in one party, as the other had reason to know, the courts find and enforce promises that were not put into words, by interpretation when they can and by implication and construction when they must; When unforeseen contingencies occur, not provided for in the contract, the courts require performance as men who deal fairly and in good faith with each other would perform without a law suit. It is thus that unanticipated risks are fairly distributed and a party is prevented from making unreasonable gains at the expense of the other. This is not making a contract for the parties; it is declaring what the legal operation of their own contract shall be, in view of the actual course of events, in accordance with those business mores known as good faith and fair dealing. By interpretation, implication, or construction, a promise will be held to have been made and its enforcement decreed. By interpretation, implication, or CT Page 12302 construction, an express promise will be held to be conditional and its enforcement denied unless the condition is performed. If these processes are too narrowly limited by judicial precedent to attain the ends of justice, such remedies as rescission and restitution are available."
I do not accept the IRI position that somehow once the arbitration process began, a good faith and fair dealing requirement is no longer applicable to the contractual dealings between the parties. The development of a dispute required a contractual response under Article 9 and imposed performance requirements under that article on the Loss Committee. The good faith requirement extends to the performance and enforcement aspects of a contract and the Loss Committee, I believe, had good faith requirements imposed on it in establishing procedures and selecting panelists for Article arbitration — the latter were the contractual obligations imposed by Article 9.
On the other hand, this doctrine is a "rule of construction" and a court can't ignore the language of the contract actually agreed upon by the parties as the quotations from Konover andMagnan make clear. Also, I have some of the same concerns mentioned earlier in the fiduciary and utmost good faith discussion. Reference to the nostrums that Volt demands that arbitration contracts must be enforced as are other contracts and that the question is basically one of contract interpretation when prior to arbitration questions arise about the arbitration process or access to the courts, don't permit the courts to ignore the effect that court intervention will itself have on the arbitration process. The "positive assurance" test set forth inUnited Steel Works of America v. Warrior Gulf Navigation Co.,363 U.S. 574, 582 (1962) is also a "rule of construction." Although admittedly the rule applies to questions of coverage, its creation reflects a policy that encourages the settlement of disputes through arbitration and not by resort to the courts.
A court should exercise a balance then between recognizing good faith contractual expectations and accepting a rule of construction that will necessarily involve it in examining the process of arbitration itself and the actions of the parties once the necessity for arbitration has arisen. The performance of every agreement to arbitrate could be said to impose good faith requirements on the participants in the contractual activity required by the agreement to arbitrate but any argument is circular that would permit this truism to obviate traditional CT Page 12303 court reluctance to intervene in the arbitration process — the whole purpose of arbitration was to keep us out.
From the outset the HSB argument based on this doctrine raises certain conceptual difficulties. In its post-trial brief of April 7, 1995, at page 101, the explicit position adopted by HSB is that the good faith and fair dealing duty apply to both the IRI staff and the Loss Committee. Article 9 is imbedded in a so-called treaty negotiated between the predecessor to IRI and certain member companies. If the duty applies to the staff and
the Loss Committee then for the purposes of this doctrine's application there is a recognition that both these entities are part of IRI. Apart from what all this may have to do with the prior asserted fiduciary and utmost good faith argument, the question becomes on what entity of IRI does Article 9 place the contractual duty of performance? The answer to that question is the Loss Committee not the IRI staff. Article 9 says the Loss Committee shall appoint the Phase II arbitrators who shall be representatives of the member companies. But certainly the Loss Committee has no separate legal existence apart from IRI and what is IRI but an association of member companies, one of which is HSB. If IRI acts, presumably it acts through its Board of Directors and Executive Committee. I don't believe this is all idle scholastic speculation but rather underlines the difficulty of imposing the HSB legal theories which are ultimately based on the nature and character of the relationships between distinct and separate parties on the entities and parties actually involved in this law suit.
In any event, what did the contracting parties (whoever they might be) bargain for? What was the reasonable contractual expectation of the parties? They bargained for the Loss Committee appointing representatives to Phase II arbitration. What was the object of that endeavor which the parties hoped would be accomplished? The necessary object was the selection of experienced, unbiased people of integrity to arbitrate the dispute between the parties. There has been no question raised as to the competence or integrity of the four panelists chosen. The way the panelists were chosen including the interviewing process certainly might have given the opportunity to IRI staff to select people biased to its position but there is no explicit claim these people are in fact biased or how in fact the selection process operated in such a way so as to ensure that people biased in favor of IRI were selected. In any event, the Restatement the comment to § 205, says as noted: "The appropriate remedy for CT Page 12304 a breach of the duty of good faith also varies with the circumstances." Parties have the right to ask a state or federal court to remove arbitrators for bias or corruption prior to arbitration. Here there is not sufficient grounds to exercise that power. Under the guise of imposing good faith and fair dealing duties on parties to arbitration agreements already under dispute (which would be true in every arbitration case brought to court) I do not believe it's appropriate for a court to grant a contract remedy that goes beyond any remedy that could be properly achieved in equity.
This answer is understandably quite unsatisfactory to HSB since how does it prove actual bias without running the risk of antagonizing the panelists already chosen. Frankly the interviewing process that occurred here would be an area any lawyer representing HSB would want to explore further and need not have to rely on the testimony of adverse parties to describe its scope.
I will not repeat my previous discussion at other portions of this decision describing the propriety of retirees being selected to the panel and whether the manner in which panelists were selected and appointed by the Loss Committee in effect meant that the Loss Committee here did not appoint these panelists. Suffice it to say that the appropriate device for member companies to protect their interests and a worthy consideration for IRI if it wishes to preserve its viability is to contemplate adopting procedures and explicit rules as to how these panels are to be constituted and chosen.
If parties do that then in accordance with my previous decision courts can and should in the appropriate case intervene prior to arbitration to enforce the panel selection and procedural process agreed upon. If courts intervene in the absence of such explicit agreed upon processes on the basis of broad ameliorative doctrines, the opportunity for confusion and inexplicable results multiply.
For example, if this case goes to arbitration and HSB were to file a motion to vacate the award, the panel selection process here, especially the interviewing that occurred, might lead a court to decide that "once an issue of partiality is fairly raised, limited discovery of the arbitrator should be allowed, focusing only on the relationship between the arbitrator and the other party". Kaufman v. Haas, 318 N.W.2d 572, 574
CT Page 12305 (Mich. 1982); Korshalla v. Liberty Mutual Ins. Co., 381 A.2d 88,90 (N.J. 1977). The result of such an inquiry might lead a court to conclude that in fact no bias or corruption existed as to the arbitrators and on that basis would not vacate the award. Yet HSB could still move to vacate after the award based on the theories it presents now and if some trial or appellate court disagrees with my decision they'd prevail. To me that result wouldn't make any sense and that's why I believe my earlier decision should be confined to the specific ambit I thought I was giving to it.
Finally, the "appropriate remedy" considerations set forth in the Restatement are underlined by the very relief sought. Although the parties could have but did not agree to specific panel selection procedures I am to declare this panel void on the basis of broad doctrines of fiduciary obligation and good faith dealing requirements. To remedy the situation the specific requests for relief ask that I appoint the arbitrators or order that a new panel be appointed in accordance with Article 9 procedures as properly interpreted by myself. It would stand the reasoning behind my opinion at 12 Conn. L. Rptr. 465, 467, on its head to say that a judge should appoint arbitrators for this panel. As I said, one of the reasons parties agree to arbitration is "to secure as arbitrators people who are skilled and experienced in the problems of a particular industry."
If I were to order a new set of panelists to be selected by the Loss Committee, would all the names on the first Tuttle-Voebel list be excluded from consideration? What about the panelists actually chosen? Would I have to intervene to decide those matters? Has the pool of appropriate candidates been polluted? To avoid possibility for further litigation do I concoct a series of procedures to be followed? Should the Loss Committee ask me from whom they can take suggestions for possible panelists? Should I decide that "retirees" can be representatives because if I decide it there is no danger the decision will be based on the desire to select particular candidates? The possibilities are endless but life, unlike this opinion, is short, so I must end the discussion.
I cannot conclude on the basis of what's been presented that the method for appointment of arbitrators or the panel composition violated Article 9. An order will enter compelling the parties to commence arbitration. CT Page 12306
Corradino, J.